UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LATOSHA M. JANNSON, | ) | |
|     Plaintiff, | ) | No. 13 C 4691 |
| | ) | |
|     v. | ) | Magistrate Judge Geraldine Soat Brown |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
|     Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Latosha Jannson brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 421, 423. (Compl.) [Dkt 1.][1] Plaintiff has moved for summary judgment. (Pl.'s Mem.) [Dkt 19.] The Commissioner opposes Plaintiff's motion and has filed a cross-motion for summary judgment. (Def.'s Mem.) [Dkt 23.] Plaintiff has replied. (Pl.'s Reply.) [Dkt 24.] The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 25.] For the reasons set forth below, Plaintiff's motion is granted, and the Commissioner's motion is denied.

---

[1] The regulations regarding DIB and SSI are substantially similar and where they do not significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000).

**PROCEDURAL HISTORY**

Plaintiff first applied for benefits in March 2010, alleging a disability beginning in February 2010. (R. 102-12.) After the agency denied her claims initially and on reconsideration (R. 58-65), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 91-92.) That hearing occurred in January 2012. (R. 24.) The ALJ then issued a decision denying Plaintiff's request for benefits on March 12, 2012. (R. 9-17.) Because the Appeals Council declined Plaintiff's request for review (R. 1-3), the ALJ's decision is the final decision of the Commissioner. *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

**BACKGROUND**

Plaintiff applied for benefits at age 33, alleging that she was disabled because of a cogenital deformity of her left hand and carpal tunnel syndrom. (R. 102, 131.) Before the alleged onset of her disability, Plaintiff worked for more than ten years as a customer-service representative for various companies. (R. 32.) Those positions primarily involved using a computer to perform data entry. (R. 31-32.) She is a high-school graduate and attended some college but did not graduate. (R. 30, 132.)

**Medical History**

Plaintiff was born with a deformed left hand with only a thumb and fifth finger, with webbing in between. (R. 139, 264.) Dr. Mangala Yeturu has been Plaintiff's treating physician since 1999. (R. 177.) As early as 2007, Plaintiff complained to Dr. Yeturu of "bilateral hand numbness and

paresthesia."² (R. 240.) Because of the paresthesia in both arms, she was diagnosed with possible carpal tunnel syndrome. (R. 239.) Dr. Yeturu referred Plaintiff to a neurologist, Dr .Arthur Itkin, who performed an electromyogram ("EMG") of Plaintiff's right hand. (R. 240.) The test did not reveal any abnormalities in Plaintiff's right hand, but Dr. Itkin noted that, on physical exam, Plaintiff's hand showed signs of possible carpal tunnel syndrome. (*Id.*)³

Throughout 2009 and 2010, Plaintiff continued to see Dr. Yeturu for pain and paresthesia in her left hand, which especially hurt when she used a computer at work. (R. 243-50.) She was diagnosed with tendinitis and encouraged to change to a job that involved less typing. (R. 243-45, 249.) She also received steroid shots four times per year to help with the tendon problem. (R. 246.)

On March 1, 2010, Dr. Yeturu completed a "return to work/school verification" form for Plaintiff indicating that Plaintiff had been unable to work because of medical treatment from February 19 to March 3, 2010. (R. 260.) On March 16, 2010, Dr. Yeturu extend this time frame to June 13, 2010, explaining that Plaintiff had been referred to orthopedics for treatment of the pain in her left wrist. (R. 261.) Dr. Yeturu's referral note, however, lists the "reason for referral" as carpal tunnel syndrome and tendinitis in the right hand. (R. 262.)

In May 2010, Plaintiff completed a "function report" describing her limitations. (R. 139-46.) She described how she could prepare cereal and sandwiches but otherwise had difficulty handling

---

² Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorland's Illustrated Medical Dictionary* 1383 (32d ed. 2012) [hereinafter *Dorland's*].

³ Specifically, Dr. Itkin reported that Plaintiff "has possibly Tinal's sign over the right median nerve at the level of the wrist." (R. 240.) As Plaintiff explains, a Tinel's sign is part of a test for carpal tunnel syndrome that involves tapping or pressing on a nerve in the patient's wrist. (Pl.'s Mem. at 4 n. 4.)

3

food because of pain and "constantly dropping things" and "causing injury to self when attempting to cook." (R. 141.) She said that she took care of her three daughters by herself and helped them get ready for school daily, but had trouble combing her and her daughters' hair and dressing herself. (R. 140.) She also described not being able to wash dishes, sweep, do yard work, or physically handle money. (R. 142.) That same month Plaintiff and her daughters moved in with Plaintiff's mother, who began helping Plaintiff with childcare and dressing herself. (R. 48-49.)

In August 2010, state agency physician Dr. Vidya Madala assessed Plaintiff's limitations based on a review of her medical records. (R. 263-70.) Dr. Madala concluded that Plaintiff "can be considered a one armed individual based on pain and deformity of the left hand" and cannot use her left arm to push or pull hand controls or "handle and finger." (R. 264, 266.) The doctor also opined, however, that Plaintiff's right upper extremity "is not limited." (R. 264, 266.)[4] Dr. Madala's opinion was affirmed in September 2010 by Dr. Ernst Bone, who simply explained that Plaintiff's condition had not changed. (R. 280-82.)

Also in September 2010, Dr. Yeturu noted that the pain in Plaintiff's left hand and wrist had radiated to her left shoulder despite treatment with steroid shots, physical therapy, and pain medication. (R. 271, 274-75.) Those treatments had only provided temporary relief. (R. 271.) She was advised to avoid repetitive work because it was causing reinjuring and excerbating her left-hand tendinitis. (R. 271, 274.) Dr. Yeturu noted that Plaintiff could not keep up with the pace of her data-entry job because of her pain and had been terminated from that position. (R. 274.)

In June 2011, Plaintiff complained to Dr. Yeturu of pain, tingling, and numbness in her right

---

[4] The upper extremity, or "membrum superius," is "the limb of the body extending from the superior part of the deltoid region to the hand." *Dorland's* at 665, 1131. The deltoid region is near the shoulder. *See id.* at 1194.

hand and wrist. (R. 182.) She reported that the pain sometimes traveled up her arm, though she denied weakness resulting from the condition. (*Id.*) Plaintiff again showed signs of possible carpal tunnel syndrome, and Dr. Yeturu prescribed a splint, diagnostic tests, and pain medication. (R. 183.) Six months later, in December 2011, plaintiff underwent a second EMG of her right hand and forearm per Dr. Yeturu's instructions. (R. 283.) Dr. Juan Valdez reviewed the EMG results and concluded that they were consistent with "cervical polyradiculopathy" (*id.*)—a type of "disease of several spinal nerve roots." *Dorland's* at 1493. Dr. Valdez also noted that Plaintiff's motor function was normal. (R. 283.)

Later in December 2011, Dr. Yeturu completed a medical questionnaire describing Plaintiff's condition. (R. 177-78.) Dr. Yeturu noted that, along with the congenital deformity of her left hand, Plaintiff had continuing pain in her right hand and wrist and was "unable to grasp or hold objects firmly." (R. 177.) She also opined that Plaintiff cannot drive, dress herself, prepare meals, or perform housework. (*Id.*) Dr. Yeturu added that Plaintiff's "condition is permanent and life long" and that she had "reached maximal medical treatments without improvement." (R. 178.) In response to the question whether Plaintiff is "capable of performing a full-time job, that is 8 hours per day, 5 days per week, on a sustained basis," Dr. Yeturu wrote, "No, per orthopedics, unable to perform simple grasping, fine manipulation, keyboarding, driving and any use of hands on a daily basis." (*Id.*)

**Hearing**

Plaintiff appeared with counsel before the ALJ on January 30, 2012. (R. 24.) She confirmed that she had not worked since 2010, when she stopped performing her data-entry job because, she

said, she could no longer perform the required "constant typing [and] entering of customers' information." (R. 33.) She testified that she "got in trouble" at work because she was not able to complete her work fast enough and took up to 15-minute breaks to do physical-therapy exercises on her wrist and hands. (R. 34, 44.) She also explained that the pain in her right upper extremity had "caught up with the left in terms of pain" and the pain was "going up to" the area between her right shoulder and neck. (R. 36, 39.) She said that her pain, on a scale of 1 to 10, "can get up to a '15,'" but that she typically does not let it get higher than 8 or 9 before taking pain medication. (R. 42-43.) The medication, she explained, helps for only "about two hours or so." (R. 36-38.)

As for daily living, Plaintiff testified that her mother cooks, does the laundry, and does most of the work to get her children ready for school. (R. 40-41.) Her mother also testified at the hearing and explained that she helps Plaintiff dress herself and Plaintiff does not help with household chores because Plaintiff's right and left hands are very weak. (R. 48-49.)

After Plaintiff's mother testified, the ALJ posed a series of questions about Plaintiff's ability to work to a vocational expert ("VE"). (R. 51-55.) If Plaintiff could perform light work with no pushing or pulling of hand controls with her left hand, no handling or fingering with the left upper extremity, and use of the left arm as an assist only, then the VE testified that she could work as an information clerk or parking-lot attendant (as long as the parking lot was "self service," so that she would not need to drive). (R. 51-53.) The VE concluded that the same jobs remained if Plaintiff could perform frequent or occasional but not constant fingering with her right upper extremity. (R. 53.) But Plaintiff would be unemployable, the VE said, if Plaintiff could perform only "occasional handling" with her right hand or needed 20-minute breaks every 40 minutes. (R. 54.)

6

**Disability Determination Process**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520.

Under the regulations, the Commissioner must consider the following: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two, or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps one to four, and if that burden is met, at step five the burden shifts to the Commissioner to establish that the claimant is capable of performing work existing in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886.

**The ALJ's Decision**

Employing the five-step process, the ALJ concluded in her March 2012 decision that Plaintiff is not disabled. (R. 9-17.) At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset of her disability in February 2010. (R. 11.) At step two, the ALJ found that the claimant had three severe impairments: "congenital deformity of the left hand; left hand tendonitis; and cervical polyradiculopathy." (*Id.*) At step three, the ALJ found that none of Plaintiff's impairments met or equaled the severity of any disability listing. (R. 11-12.) At step four, the ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work that did not require her to climb ladders, ropes, or scaffolds, or use her left hand for anything other than as an assist. (R. 12.) The ALJ also concluded that she could "perform frequent, but not constant, fingering with the dominant right upper extremity." (*Id.*) Given that assessment, the ALJ decided that Plaintiff could not perform her past relvant work. (R. 15.) At step five, however, the ALJ decided that, based on the VE's testimony, Plaintiff would be able to work as an information clerk or parking-lot attendant. (R. 16.)

In making her decision, the ALJ explained that she gave "great weight to the opinions of the State agency medical consultants," Drs. Madala and Bone, because their "determinations were consistant with the overall evidence." (R. 15.) The ALJ did not give controlling weight to Dr. Yeturu's opinion that Plaintiff could not perform full-time work because, the ALJ concluded, her opinion was "not supported by her treatment notes." (*Id.*) The ALJ did not say what, if any, weight she did give to Dr. Yeturu's opinion. The ALJ noted, however, that the assessed RFC took into account that Dr. Yeturu had taken Plaintiff "off work for 3 months and then limited her to no repetitive work" and that Plaintiff "had been advised to avoid a data entry or typing job which could

8

aggravate her condition." (*Id.*)

The ALJ also concluded that Plaintiff's testimony about the severity of her symptoms and limitations was not credible. (R. 14.) The ALJ emphasized that "the record documents minimal complaints of problems with the right upper extremity" and that Plaintiff had continued to work and apply for data-entry jobs despite her complaints of hand problems. (*Id.*) The ALJ also noted that, although the Plaintiff and her mother testified that she was "severely limited in her ability," Plaintiff had reported on the function report she submitted in 2010 that she was able to prepare simple meals, vacuum, wipe tables, iron, and shop. (R. 14-15.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). Where the Appeals Council declines a requested review of an ALJ's decision, it constitutes the Commissioner's final decision. *Villano*, 556 F.3d at 561-62. While an ALJ's legal conclusions are reviewed *de novo*, her factual determinations are reviewed deferentially and are affirmed if they are supported by substantial evidence in the record. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support the decision. *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673. "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors her ultimate conclusion. *See Murphy v. Astrue*, 496

F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and logical bridge between the evidence and the conclusion, so that a reviewing court may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Craft*, 539 F.3d at 673. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

**DISCUSSION**

Plaintiff's memorandum in support of summary judgment focuses on the contention that the ALJ underestimated the problems with her right hand. To that end, Plaintiff contends that the ALJ erred in analyzing (1) the medical opinion evidence, (2) her RFC, and (3) her credibility.

**1.     Opinion Evidence**

Plaintiff first argues that the ALJ erred by not giving good reasons for rejecting Dr. Yeturu's opinion and giving great weight to the opinions of non-examining physicians Drs. Madala and Bone. (Pl.'s Mem. 8-14.) She emphasizes that, according to federal regulation, the agency is to evaluate the length, nature, and extent of the treatment relationship in assigning weight to a treating physician's opinion if not giving that opinion controlling weight. *See* 20 C.F.R. § 404.1527(c). Plaintiff points out that Dr. Yeturu treated her since 1999 and managed all of the care for her arm problems, and she was the only examining doctor to offer an opinion of Plaintiff's ability to work. (Pl.'s Mem. at 9-12.)

In response, the Comissioner argues that the ALJ provided sufficient justification for giving

Dr. Yeturu's opinion less weight by stating that the doctor's treatment notes did not support her opinion about Plaintiff's ability to work. (Def.'s Mem. at 4.) The doctor's notes, the Commissioner maintains, do not document "debilitating limitations in Plaintiff's right hand/arm." (*Id.*) The Commissioner emphasizes that the ALJ needed only to "minimally articulate" her reasons for discounting Dr. Yeturu's opinion. (*Id.*, citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).)

"A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. " *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted). Even if not giving the opinion controlling weight, an ALJ must give "good reasons" for discounting a treating physician's opinion. *See Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). "Generally, the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the agency] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). Non-examining sources also generally do not carry significant weight in comparison to treating physicians. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Here, Dr. Yeturu was the only treating physician to offer an opinion of Plaintiff's ability to work. At the time of that assessment, Dr. Yeturu had been Plaintiff's treating physician for twelve years and managed all of the care for her hand problems, repeatedly sending her to orthopedic specialists, reviewing the results, and exploring different treatment options. Although the ALJ dismissed Dr. Yeturu's opinion as "not supported by her treatment notes," the ALJ did not cite any particular conflicting treatment note, explain why Dr. Yeturu's notes were inconsistent with her

opinion, or question her impartiality. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (noting that treating physicians may "be unreliable if the doctor is sympathetic with the patient").

The Commissioner asserts that the ALJ was right to impugn Dr. Yeturu's opinion because there is a lack of documentation in the record of "debilitating limitations" in Plaintiff's right hand. The ALJ, however, did not provide that rationale in her opinion, which the Commissioner may not defend using post hoc reasoning. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). Further, Plaintiff's right-hand problems did not need to be "debilitating" to cause her to be disabled. The VE testified that even if Plaintiff were limited to "occasional" handling and fingering, there would not be any work she could perform. (R. 54.)

Moreover, as Plaintiff points out, Dr. Yeturu's opinion does not appear to be inconsistent with her treatment notes. (Pl.'s Mem. at 11-12.) Those notes reveal that the condition of Plaintiff's right hand began to worsen in June 2011, nearly a year after the state-agency doctors completed their review of Plaintiff's records. (R. 182.) At that time, Plaintiff's right hand and wrist showed signs of carpal tunnel syndrome, and Dr. Yeturu prescribed a splint and pain medication. (R. 182-83.) Six months later, an EMG test of Plaintiff's right hand evinced nerve disease (R. 283), which the ALJ acknowledged as one of Plaintiff's severe impairments (R. 11). When Dr. Yeturu completed her medical assessment, she explained—consistent with her June 2011 notes and the EMG report—that Plaintiff had continuing pain in her right hand and wrist. (R. 177.) The record contains no other assessments, from either examining or non-examining doctors, of the condition of Plaintiff's right hand after it appears to have deteriorated in 2011. Nonetheless, the ALJ credited outdated opinions from non-examining physicians the over more-recent opinion of Plaintiff's longstanding doctor. That decision constitutes reversible error. *See Moore v. Colvin,* 743 F.3d

1118, 1127 (7th Cir. 2014) (remanding when ALJ was inappropriately "dismissive" of treating neurologist's opinion); *Scott*, 647 F.3d at 739 (remanding when ALJ "was too quick to read inconsistency into [treating physician's] statements" and did not evaluate the frequency and extent of treatment relationship); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (remanding when ALJ rejected examining physician's opinion based on questionable contradicting opinion of non-examining physician).

**2.      RFC**

The ALJ's erroneous treatment of Dr. Yeturu's opinion also plays into Plaintiff's second argument: that the ALJ mistakenly concluded that Plaintiff can perform "frequent, but not constant, fingering with the dominant right upper extremity." (R. 12; Pl.'s Mem. 15-18.) Plaintiff points out that the agency physicians described Plaintiff as having no limitations in her right upper extremity, and yet the ALJ decided to assess "additional limitations" in regard to her ability to finger with her right hand. (R. 15.) The ALJ's recognition of that limitation seems to give credence to Dr. Yeturu's opinion that Plaintiff's right hand could not "grasp or hold objects firmly," or "perform simple grasping, fine manipulation, [and] keyboarding." (R. 177-78.) But if the ALJ gave some weight to Dr. Yeturu's opinion, it is unclear why she then decided Plaintiff was limited to frequent "fingering" but was not limited in her ability to grasp, hold, or manipulate with her right hand. As Plaintiff notes, the ALJ is not permitted to play doctor and reach her own independent medical conclusion unsupported by evidence in the record. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

In response, the Commissioner points out that "RFC is a legal determination reserved for the ALJ and not any doctor," and "the RFC need not adopt any medical opinion." (Def.'s Mem. at 6,

citing 20 C.F.R. § 416.927(e)(1); *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir. 1995).) Thus, the Commissioner argues, "Plaintiff can hardly fault the ALJ for reasonably (and slightly) tempering their assessment in her favor based on" her complaints of pain in her right hand and wrist, the EMG consistent with nerve disease, and Dr. Yeturu's recommendation that Plaintiff avoid extensive typing. (Def.'s Mem. at 6.) The problem is, however, that the ALJ did not build the necessary logical bridge to explain why she credited Plaintiff's complaints of pain and Dr. Yeturu's opinion in regard to fingering but not in regard to handling, grasping, or fine manipulations. That type of cherry-picking of medical evidence is impermissible. *See Bates*, 736 F.3d at 1099 (holding that ALJ impermissibly "cherry-picked" medical statements from record); *Scott*, 647 F.3d at 740 (holding that ALJ was not allowed to "cherry-pick" from treating physician's notes). Additionally, the error was not harmless because, as noted above, the VE testified that Plaintiff would be disabled if limited in her ability to perform handling.

### 3. Plaintiff's Credibility

Finally, Plaintiff argues that the ALJ erroneously discredited her testimony about being severely limited in her daily activities. (Pl.'s Mem. at 18-22.) In response, the Commissioner emphasizes the high standard of review for credibility findings: They are reversed only if "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Because the court is remanding on other grounds, it is not necessary to resolve whether the ALJ committed reversible error in addressing Plaintiff's credibility.

Nonetheless, on remand, the ALJ should consider two of Plaintiff's arguments. First, Plaintiff points out that the ALJ held it against her that she had continued to apply for work after her

alleged date of disability, but the ALJ did not discuss whether she was forced to seek employment out of financial desperation. (Pl.'s Mem. at 19-20.) As the Seventh Circuit has explained, "[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling." *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003). It may be that Plaintiff's assertions about her limitations are undermined by her efforts to represent herself as employable, but given the concerns expressed in her brief, the ALJ may want to consider whether Plaintiff was merely pushing herself to seek work, despite disability, because of financial difficulty. *Compare Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (concluding that "[t]he fact that [plaintiff] pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that she was disabled"), *with Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (refusing to overturn ALJ's mention of plaintiff's application for unemployment benefits as adversely affecting credibility).

Second, the ALJ's reliance on Plaintiff's self-assessment of her limitations in her May 2010 function report is questionable. The ALJ read that report with rose-colored glasses, noting only that Plaintiff stated in the report that "she helps her children with bathing, combing hair, preparing breakfast, and with homework and that she also prepares simple meals, vacuums, wipes tables, irons, and shops for clothes and groceries." (R. 14-15.) The report also says, however, that Plaintiff could not comb her own hair, needed assistance preparing meals beyond cereal and sandwiches, found it "difficult and painful" to handle food, and was "constantly dropping things" and "causing injury to self when attempting to cook." (R. 140-41.) Moreover, Plaintiff completed the report a year and a half before she testified at her hearing, and more than year before the condition of her right hand deteriorated in 2011, so its usefulness in assessing Plaintiff's later limitations is dubious.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt 19] is granted, and the Commissioner's cross-motion for summary judgment is denied [dkt 23]. The case is remanded pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. Judgment is entered for the Plaintiff and against the Commissioner.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: April 17, 2015